Case number 22-5295, Center for Biological Diversity et al. v. National Marine Fisheries Service at Gina Raimondo Interoperational Capacity at Secretary of Commerce. Mr. Eaton, Mr. McMartle for the embassies. All right, Mr. Eaton, good morning. Good morning, and may it please the court, my name is Chris Eaton for Appellant Conservation Groups. I'd like to reserve two minutes for Mr. McMartle to begin. I'd like to begin the notice and comment violation because all of the claims in this case present problems. Can I ask you to either get closer to the microphone? I apologize. Thank you. I'd like to begin with the notice and comment violation because all of the claims in this case concern problems that might not have been an issue if only the service had given the public a chance to weigh in on the 40-foot standard. And I'll discuss the arbitrary justification issue second. So if an agency is going to announce a new standard in a final rule that defines which entities are going to be subject to a regulation, it has to have given some notice that a change to that ultimate standard was possible. Otherwise, interested parties can't know that they're supposed to comment on that subject or the issues that it raises. The proposed rule here gave no indication that the service might come up with a new regulatory standard in the final rule. And that new standard raises a bunch of new issues that weren't in the mix for the approaches that it mentioned in the proposed rule. So first, it results in much higher levels of sea turtle mortality, double the level of sea turtle mortality of the least protective regulatory option that it said it was considering. And that presents much different implications for the recovery and conservation of sea turtles. And commenters couldn't have known that they were supposed to comment on what those implications might be because the service never indicated that it might adopt a regulatory standard with such a higher level of mortality. It actually indicated the opposite. And the service said in the proposed rule at Jade 259 that it was rejecting the much narrower option for exempting skimmer turtles under 26 feet because that didn't provide enough protection for sea turtles, that it was too broad of an exemption. So how could commenters read that and then anticipate that the service would ultimately come up with a much broader exemption that provides much less protection for sea turtles? And that's the sort of flip-flop. Because protection wasn't the only parameter that the agency had to consider. They had to consider other things like economic impacts on fisheries. Correct. Correct, Your Honor. And what is the authority for that, that they had to consider economic impacts? We don't disagree that economic impacts are relevant. Our point here is that they were not an independent basis for the rule. They were a balance of economics and conservation. Protecting endangered species, economics. I think that that question is not necessarily presented here. I think that would be our client's position. The service didn't say in the rule that it trumps. The service doesn't say in its brief that it trumps. The service said it relied on multiple factors to reach this decision. So I just want to understand, you're challenging the fact that they adopted a rule with a 40-foot boat limit instead of a 26-foot boat limit because 26 was the only number that they included in their proposed rule. And I think you would agree, would you not, that they didn't have to put the number 40 in the rule in order to end up promulgating a rule that had that number in it? Yeah, we would agree. I think what they had to say is that they do a length other than 26. Well, didn't they say that, JA256, they said they might phase in the new TED requirements based on vessel size. So the largest vessels would be the first vessels required to install. Why doesn't that put people on notice? So a vessel could be greater than 26, perhaps 40. So the phased-in approach, the service explains that the reason for the phased-in approach is because it's going to take a while to produce TEDs. And so the phased-in approach was how to prioritize which vessels get TEDs first. And it explains in that approach that the vessels that are not required to have TEDs right off the bat would be required to have TEDs under the rule. And it talks about the issue with the phased-in approaches. I'm just wondering why that doesn't give you notice that 40 is an option. Because in that proposed rule, it said 26, but didn't say why 26. It never said because of safety, because of economics, because of anything. It just said, here's 26, maybe trawlers of 26 feet in length. And then there is discussion about other boat lengths. I don't know what else the agency is supposed to do to put you on notice that it could be 40, short of having to put in 40, which you agree they don't have to do. So I want to add two points on that. So first, the phased-in approach, saying that this rule will require TEDs on all vessels and they'll have to have them at different times is a very issue than saying we're going to only require them on some subset and the other subset will never... How is that different? Isn't that a phased-in approach? Let's start with the 40-length boats and then later we might make it 26. The phased-in approach, the way that it's presented, is under this rule, this rule would require them on all vessels. And the only difference is the timing. The regulation would say all vessels... That's not exactly, but you also had noticed it could just be trawlers in a different place. But this, if we're just talking about boat length, you're on notice about boat length. That it could change. It could be something greater than 26 because they're going to phase this in. I think it would be that they would still require all vessels to have TEDs. And the only difference would be the... So let's back up. There were seven different alternatives. Some of them said all, some of them some subset of all. Two of them said 26 feet in length. And I thought that your claim here is that we had no notice it could be 40 feet in length for the boat. And I'm just asking why didn't you have notice of that based on this provision? Based on the phased-in? Yeah. Because the phased-in explains that the regulation would cover all vessels. And the only difference... You have notice about all versus subsets. You don't contest that. You had notice that it didn't have to be all vessels. It could be a subset. Do you agree with that? Yes. And so the other point... So let's focus on boat length. Yeah. So the other point I want to make there is that the service explained that the reason that it had that 26-foot option is because it considers skimmer trawls under 26 feet to be different from all other skimmer trawls. Because they have... Where is that in the proposal? They explain that in the draft EIS. And I don't have the site handy and I can find it. Okay. Yeah. So and they explain in the final rule as well that they consider vessels under 26 feet to have unique data limitations, unique operational constraints that vessels larger than 26 feet don't. And so when they're telling commoners, you know, we may consider vessels under 26 feet to be for an exemption for very specific reasons. That gives no notice that commoners should anticipate that they might exempt a different set of vessels. Okay. Well, that did it. But why doesn't this provision about phasing in give you notice about 40 feet? Because I think the phase-in approach, let's say that basically what they would say is we're going to require based on vessel size. It's saying that we will still require the TEDs on all sized vessels and the only difference will be the timing of when those requirements kick in under the rule. And that's different than saying we are not going to require them at all on vessels that are over a certain size. Okay. I see that I've used up my first eight minutes. All right. Good morning, Kevin. I'm Kevin McCardle on behalf of the National Marine Fisheries Service and may it please the court. I'll start with the logical outgrowth issue, unless the court would like me to start with a different issue. But first, I'd like to address your point, Judge Henderson, about environmental concerns not trumping or economic concerns not trumping environmental protection. And that's not what happened. This regulation is protective. It reduces sea turtle mortalities in comparison to status quo by more than a thousand a year. Most of the conserved sea turtles would be endangered Kemp's Ridleys, which the service disclosed in the rule. So this is a protective beneficial regulation that contributes to species recovery. There's no requirement in the ESA that the agency achieves species recovery in one fell swoop by one action. It's permissible to take an incremental step, especially whereas here a greater step would have such a significant economic impact on fishery participants. So this was a rational decision by the service based on permissible factors, which is all that's really required. They achieved a significant conservation benefit, which no one disputes, while substantially reducing the economic impacts by up to 73%. And the final rule is clearly a logical outgrowth of the proposal because the proposal was, hey, we're going to expand the required use of TEDs to all skimmer trawl vessels. The final rule expanded the requirement to a subset of skimmer trawls based on vessel length, which was an issue disclosed in the, which was a basis for the alternatives considered in the final rule. Can I ask you a question about the Fox television case from 2009? I think the district court cited and it's, you know, big case. And I take it to mean that when an agency changes its policy for discretionary reasons, it has to explain the new policy, but it doesn't necessarily have to explain the new policy rather than the old policy, so long as it recognizes it's changed the old policy. If we think of the 2016 proposal as the agency's thinking in 2016, and then think about how it changed its thinking in 2019, Fox is maybe a pretty good case for you here. But I read it to, I think maybe it could be read to suggest that when that change happens, it has to be, it cannot, sorry, when the change happens, it cannot be based off of circumstances that were central to the prior policy, unless it explains, unless it explained that. Do you agree? Well, first off, I'm not sure if it's appropriate to apply Fox to a situation where you're talking about a change from a proposal to a final rule, because the issue there is you're changing a final policy to another policy. So I'm not sure if the whole rubric applies, but even if it did, it's a two-part test. You have to show, the agency has to show that it was aware of the change and give reasons for it. That's it, as far as I recall that case. Give reasons for the change, and it has to give reasons for the new policy, not necessarily reasons why the old policy wasn't good enough. Right. And I think. And so I'm with you on that. And I take your, I want to come back to the first point you made, because I think there might be something to that too. But I take to sort of, I take it to be maybe sort of an exception to that, that if the agency's old policy was grounded in some facts that haven't changed, the new policy may need to. Does that matter? I'm not sure if that would matter. I mean, I think, strictly speaking, the only requirement, other than being aware that you're changing your policy, is to give reasons for it. And they gave a good reason here. The facts did change. They received comments from, you know, well. I don't know. Like, they knew what it was going to cost before, and that understanding of what it would cost didn't change. They just decided in 2019 it wasn't worth the cost. And I take your argument to me, that's a policymaking decision that they're allowed to make without having to hold proposals. Well, I don't think it would be fair to say that FOX stands for the proposition. The agency says, hey, we were aware of these economic impacts before, but now we think it's a bigger deal. And we're going to draw the line somewhere else now, because we're prioritizing, to some extent, these economic impacts more than we did before. That's perfectly. I think that's right. I think you're right about that. And can you return to the point that you made about maybe FOX doesn't even apply here at all? Well, I think the FOX rubric is aimed at when an agency actually changes its final policy from A to B. And here we just have a proposal, which the entire point of publishing a proposal for notice and comment is to solicit suggestions for change. So, again, I didn't look at that case because it wasn't cited up here, but I've read it before, and I don't think it's meant to apply to a proposal, a change from a proposal to a final decision. I think the logical outgrowth test is more the appropriate analytical rubric. That might be right. And I think it was clearly satisfied here. I mean, the Supreme Court in the Long Island Care at Home case essentially made the point that not adopting a proposal is always a logical outgrowth of the proposal. And they cited this court's decision in the Arizona Public Utilities case where the agency proposed to subject tribes to all of the same requirements as states, statutory requirements, and then its final decision only partially applied tribes to those requirements. So that shows that the Supreme Court also drew the connection between not adopting a proposal or partially adopting a proposal as being a logical outgrowth of the were disclosed in the proposal. I mean, if you look at the table on JA46, that starkly highlights the difference between the alternatives. And it shows that the major considerations were the number of sea turtles that would be conserved versus the economic impacts. Those were the competing considerations. And the agency disclosed that it was considering alternatives based on vessel size and that the more vessels you include, the greater the conservation benefit, but also the greater economic impacts. And ultimately, its final decision was- Sorry, I don't see a table at JA46. 246. Oh, okay. It's in the draft environmental impact statement. Oh, I see. It just, that starkly lays out central considerations. Conservation benefits essentially against economic impacts. And it shows how those change as the alternatives, two of which were based on vessel size, under each alternative, two of which were based on vessel size. So the final decision wasn't based on some new factor, as in the Fertilizer Institute case, or even in CSX case cited by the plaintiffs. It was based on these specific considerations that were disclosed. So it was clearly a logical outgrowth of the proposal. I'm sorry, is vessel size supposed to be in this chart? Because I don't see- This shows the alternatives and the- Oh, you're saying within the alternatives, there were vessel size. Yes. 26 foot alternatives. Right. They're discussed earlier in the draft, EIS. So everyone understood that the service was drawing the line based on vessel size and that the competing considerations were conservation benefits and economic impacts. And the final decision was based on those same factors. So it's most definitely a logical outgrowth. Your opposing counsel did not contest that economics can be a factor. So I think you two agree about that. What's the authority for that? Well, I think the service could permissibly weigh economic considerations in deciding when to draw the line based on the statutory language in sections 4D and 11F of the ESA, which essentially give the agency discretion to promulgate regulations as necessary and appropriate in section- necessary and divisible in section 4D and as appropriate in section 11F. That in conjunction with the Supreme Court's decision in Michigan v. EPA clearly indicates that economic considerations fall within the broad scope of appropriate and divisible considerations that the agency at least has discretion to weigh. And that's undisputed, of course. You think everyone could understand from the- this goes to the logical outgrowth point. You think everyone could understand from the 2016 proposal that it was possible you might eventually draw a line about vessel size when only two of the seven alternatives included vessel size? Yes. That in conjunction with the other portion of the proposal that Judge Pan discussed, where we said, hey, we're considering phasing in the requirements based on vessel size with the theory that larger vessels have greater potential to interact with sea turtles in the fishery. So we'll get the greatest conservation benefit by targeting those larger vessels. And that's the same logic that the service used in the final decision. So those combination of factors, I mean, it's hard to imagine what would be a logical outgrowth if this wasn't, particularly when the case law is clear that the agency doesn't have to choose 26 feet. It didn't have to do that. It could change the number. So unless the court has any further questions for the reasons stated here in our brief, the district court's well-reasoned judgment should be firm. Mr. Aiton, how much time does Mr. Aiton have? I'll let you take two. Okay. Thank you, Your Honor. So I want to address two points. So first, we're not talking about the option of not adopting a regulation at all. We're talking about an option of adopting some regulatory standard that the service never even mentioned was possible in the proposed rule. And the draft EIS, which at JA-221 to 223, explains that it came up with this 26-foot standard because those vessels are unique. And that's what the service said it was contemplating might be an option for the final rule. That would have been a logical outgrowth. The service never said anywhere that it might come up with a number different than 26 feet in terms of which vessels are required to have TEDs and which are not. What do you think that they need to have said to put you on notice of this? I think what they would need to say is, here's a 26-foot option. We are considering other options for a yes or no required. Not phased in, but our TEDs can be required at all. Why does it have to be that exact? I think they, because ultimately the outcome of the regulation is who is going to be regulated. And I think regulated parties, interested parties here need to know who might be regulated in the final rule to comment. And so there needs to be some indication that there's going to be some change. They don't have to stay 40 feet. But aren't you on notice because they were considering not having a boat limitation at all, a boat length limitation at all. So everybody who owns a boat is on notice that this might apply to them. Perhaps, but for our clients, for conservation groups, the notice here is... But you just said it's for the people who are going to be regulated. Well, I think... Everybody who owns a boat is on notice that they could be regulated. The question here is not, we're not looking at particular, like the notice question is not about trying to break out the public interest of parties into different sectors. It's a general... I was just following up on your previous answer. And so I think they, just to finish up, I think they need to open it and say they might do something different than 26 feet. They might have to give some indication of what that metric was. Say we're going to do length versus... Just last question, but didn't they do that by giving you seven alternatives, five of which meant all boats with no limitation on boat length? They did not give any indication that they might come up with any length other than 26 feet. So the proposal, what they said is you could expect either all vessels are going to be or all vessels greater than 26 feet. And that matters because the vessels are operationally different. Vessels that are under 26 feet are fishing in very shallow waters, about four to five feet deep, where there are very few sea turtles. Vessels that in the 26 to 40 feet range are fishing in about 10 feet of water, which is like the hot spot for Kemp's Ridley turtles. And so the options in the proposed rule, either all or vessels over 26 feet, we don't have to worry about whether TEDs are going to be required where vessels are overlapping with Kemp's because all of the options would require TEDs in that habitat. But then when you say the exemption is 40 feet, now you've got this set of vessels that's fishing in prime Kemp's Ridley habitat that nobody had any notice might be exempt from TED requirements. And that's just something that we would have raised in comments and discussed. Can I ask you one question? Would you concede that the agency here does not have to explain why the 2019 rule was better than the 2016? Well, you can see that what our argument, what they have to explain is that the 2019 rule was reasonable. What they have to do is when they give reasons for what they're doing, those reasons have to be based in fact, they can't be arbitrary. And they said they drew the line and said safety justifies setting a standard 40 feet. But the findings in the rule and in the IS all said we only have safety issues. We've only identified safety issues for vessels under 26 feet. And they explained in the final rule that they've done extensive TED testing on vessels over 26 feet. And so they've got this testing information. They know from there, they haven't said that there are any safety or performance issues based on that TED testing information. And we'd urge the court to look at that. And the citations in the final rule where they talk about the testing are JA 428 to 430 and 432. And the final rule directs readers to look at the final EIS for more detail. And that detail is in the administrative record at AR 1689 to 1690. So when they said that they've got that safety justifies a 40 foot standard, that choice is inconsistent with what the agency found. And an agency can't regulate where the reasons for regulation don't match up with its findings. All right. Thank you. Okay. Thank you.
judges: Henderson, Walker, Pan